**HOOVER COMPANY, a Corporation, Plaintiff,**

v.

**MITCHELL MANUFACTURING COMPANY, a Corporation, Defendant.**

**No. 50 C 1568.**

United States District Court
N. D. Illinois, E. D.

Sept. 9, 1958.

Harry S. Demares, Stuart S. Ball, Chicago, Ill., R. R. Fitzsimmons, North Canton, Ohio, Albert Pendleton, Olson, Mecklenburger, Von Holst & Neuman, Chicago, Ill., for plaintiff.

Max R. Kraus, Casper W. Ooms, Robert C. Williams, Chicago, Ill., for defendant.

KNOCH, Circuit Judge.

The above entitled cause having come on regularly for trial and the Court having duly considered the evidence and the post trial briefs filed by the parties, and being fully advised in the premises, on the whole record now makes the following:

### Findings of Fact

1. Plaintiff is a corporation of the State of Ohio, having its principal place of business at North Canton, Ohio. Defendant is a corporation of the State of Delaware, having its principal place of business at Chicago, Illinois.

2. Plaintiff sues under the patent laws of the United States charging infringement of claims 10, 14, 24, 26, 29 and 30 of the Babcock patent No. 2,391,-859, which plaintiff has owned since its issue, by manufacture, use, and sale, by defendant of window-type air conditioners.

3. Plaintiff's patent No. 2,391,859 issued in the name of Earl Babcock as inventor, on January 1, 1946, on an application described as a division of an application filed November 7, 1931. It issued with a total of 38 claims, eleven of which have been disclaimed and seven of which were dropped from this case, six being now asserted.

4. The Babcock patent in suit, in its drawings and specification, discloses an air conditioning device formed for mounting on a window sill. Its mechanical components, not specified as to size or capacity, comprise mechanical refrigeration elements. The cold side of the system comprises an evaporator exposed to the air of the room, with a fan for blowing room air over the evaporator. The hot side of the unit which comprises a compressor and a condenser together with a fan for blowing outside air over them is separated from the cold side by a partition and is exposed to the outside air. The partition has an opening through which outside air may be admitted for mixing with room air, and this opening can be closed by a small door. A drip tray and trough under the evaporator catch the drip and conduct it outside the building. The entire unit has a casing of a shape of a letter L or inverted U to embrace a window sill so that the hot side of the system is hung outside the window and below the level of the sill, while the cold side rests upon the sill and above depending clamps which hold the unit in position.

5. The original Babcock application was filed November 7, 1931; after more than five years' prosecution it stood with some claims allowed. Plaintiff then filed a divisional application, transferred the allowed claims to the new application, on which the patent issued January 1, 1946, more than fourteen years after its application date.

6. The devices accused of infringement herein have been made and sold by defendant at a regular and established place of business maintained by it within the Northern Judicial District of Illinois. Such manufacture and sale have occurred both prior to and subsequent to the date of filing of the complaint herein and are continuing.

7. It is stipulated between the parties for the purposes of this case that:

"Earl Babcock, patentee of patent No. 2,391,859 in suit, conceived the subject matter of the said patent at least as early as August 26, 1931, made the drawing identified as Sheet No. 4936 * * * on August 26, 1931, and disclosed the said subject matter and drawing to others on August 27, 1931, proceeding immediately thereafter with the preparation of his original patent application Serial

No. 573,564 and with the filing thereof in the United States Patent Office on November 7, 1931."

8. Plaintiff has built only one machine under its patent, a single room cooler, which does not closely resemble the drawing of the Babcock patent. It was built in 1951. Meanwhile other manufacturers had made domestic window air conditioners in large numbers similar to the units built by defendant. During the fourteen year period aforesaid, the application, of course, was not available to the trade or the public who did not know what was in Babcock. The industry in 1931 started to manufacture and sell window air conditioners without any knowledge or disclosure from Babcock.

9. Plaintiff's patent states that air conditioning units had previously "been proposed which are suitable for use in a room and which employ a refrigerating apparatus to cool the room air." (p. 1, col. 1, lines 5–10)

10. July 25, 1950, before this action was commenced, plaintiff disclaimed claims 6, 7, 9, 11, 12, 13, 16, 21, 27, 31, and 32 of the Babcock patent stating that " * * * it has reason to believe that through inadvertence * * * the specification and claim of said Letters Patent include that of which said patentee was not the first inventor." Plaintiff's position is that each of those claims was characterized by express or implied reference to means to facilitate condensate disposal by subjecting the condensate to the heat of the condenser elements, which, plaintiff states, is not involved in the claims in suit.

11. Mechanical refrigeration was a fairly well developed art before the decade preceding the filing of the Babcock patent application. There were two basic types: in one, the mechanical system, a gas was compressed in a motor driven compressor and liquefied in a condenser (the hot side). This produced heat which was dissipated by exposure of the compressor and condenser to either the surrounding air or a cooling liquid such as water. The liquidated gas was evaporated in an evaporator where it was permitted to expand (the cold side). As the gas expanded it extracted heat from the surrounding atmosphere. The system thus comprised a "hot side" where heat was released to the surrounding atmosphere or cooling agent, and a "cold side" where heat was extracted from the surrounding air.

Besides the mechanical refrigeration system, there was a gas absorption system whereby through a complex liquid system a gas could be liquified by the application of heat without the use of a motor driven compressor, and the liquefied gas evaporated in a manner similar to that employed in mechanical refrigerators.

Babcock makes no claim to the invention of either of these systems, both of which were in use in domestic refrigeration, including air conditioning, long before August 26, 1931.

12. The evaporator in any refrigeration system, if exposed to air of ordinary humidity at room temperatures, would necessarily condense moisture from the surrounding air upon the evaporator, just as a pitcher of ice water will do in a warm room. One of the features to which Babcock lays claim in his patent is the provision of a drip tray beneath the evaporator from which the drip or condensate would be discharged through a tube outside of the room.

13. Before Babcock's earliest date mechanical refrigerator units consisting of a motor, compressor and evaporator system, had been built as an integral portable structure which could be set into an opening in the wall of an ordinary domestic refrigerator with the "hot side" outside of the refrigerator wall and the "cold side" or evaporator within the refrigerator body.

14. As early as February 7, 1918, the patentee of the Kramer patent No. 1,706,-852 proposed to use a portable mechanical refrigeration unit in a window mounting to air condition a room. He stated in his patent (p. 1, line 50) that the unit "may be of any well known type," indicating

that mechanical refrigeration units had been developed prior to that time. He used a hot side comprising a motor-driven compressor and a condenser, with a fan to draw room air over them to cool them, the air then passing out the window. His cold side was an evaporator, with a fan to push air over the evaporator. He enclosed the hot side in a casing, separated the hot side from the cold side with a partition, and supplied a drip tray and tube to collect the condensate from the evaporator. Babcock mounted a similar unitary structure astride the window sill, rather than at the top of the window opening.

15. There was no evidence in the record to show that anybody had considered the provision of a room air conditioner as presenting any problem in August 1931. Mechanical domestic refrigeration was still quite recent and was being rapidly extended in use, but there was no showing of an expressed demand for room air conditioning units. Babcock's contribution was that he took an integral mechanical refrigeration unit mounted on a common base and so arranged the parts that the unit could be placed on a window sill with a drip pan under the evaporator and a tube connected thereto to carry the drip outside of the room. While the Babcock patent shows a casing in the shape of an inverted L or U which sits astride the window sill, the commercial devices that have gone into use and those here accused seem all to be in more or less rectangular cabinets which are mounted on brackets by which they are secured to the window opening of a room.

16. Years prior to the stated conception date of Babcock, it had been common to mount various ventilating, heating, and cooling devices on window sills. The Booraem patent, No. 1,000,366, was granted August 15, 1911, for an improvement in a Portable Temperature-Regulating Ventilator for mounting in a window. Booraem showed a unit mounted on a window sill and containing a heating radiator and a fan adapted to blow fresh outside air over the radiator and into the room.

17. The Keith patent No. 1,028,221, granted June 4, 1912, shows a window sill mounted ventilator having a fan adapted to pull outside fresh air into a casing, and there to mix it with air drawn from the room, passing this mixture into the room.

18. The Wegner patent No. 1,121,542 shows a ventilator having means to heat the incoming air in the winter and means to cool the incoming air in the summer, which is also mounted on a window sill.

19. The Welch patent No. 1,854,569, application for which was filed on October 11, 1930, shows an "air conditioning device" having means to heat or cool incoming air, and formed for window sill mounting.

20. Application for the Sherman patent No. 1,890,626 was filed October 25, 1926. It shows a portable air conditioning device having a mechanical refrigeration unit used to condition the air in a room and connected to the outside air by a pair of ducts which pass through a baffle or separator plate on a window sill.

21. The application for the Ballard patent No. 2,099,188 was filed October 23, 1931. It too shows similar structure, but uses shorter ducts of a more flexible construction. Ballard shows the "console" type of air conditioner. Babcock uses a window sill mounted type.

22. Application for the Melcher, No. 1,825,808, patent was filed on September 2, 1930. It is addressed to an air conditioner for use with a railway car. It employed a unitary portable mechanical refrigeration apparatus of sturdy construction to handle the abuse of railroad operation. It was built for mounting beneath the floor of the car. It differs from the showing of the Babcock patent in that it has no means for getting rid of condensate and is mounted in the floor rather than in a window.

23. Application for the second Melcher patent, No. 1,921,257, was filed July 18, 1931. It shows an air conditioner

which was an improvement on the unit of the earlier patent, employing the same basic components, although of a more refined nature, with special provisions to feed fresh air over the evaporator and into the car and to recirculate air from the car through the evaporator chamber. It also had specific provision of a drip tray and tube designed to collect the condensate from the evaporator plate and to conduct it out of the unit. Neither this patent, nor the application from which it matured, was cited against the Babcock application. Melcher shows an evaporator or "expansion coil" (the cold side), a tray or basin to catch the drippings from the evaporator, a drain pipe to conduct the condensate or drippings outside the unit, through the hot side, and a fan to draw in outside air, pass it over the evaporator, and discharge it into the car. For the hot side of the equipment, Melcher shows a compressor, a condenser, and a fan to draw in outside air past the condenser and compressor to keep them cool. The hot side is separated from the cold side or evaporator by a sealed partition or wall.

24. Babcock does nothing that Melcher has not done prior to Babcock. Both condition and recirculate room air. Both are self-contained portable units. Both have mechanical refrigeration units. Both mount the cold side for communication with the air of the room and use a fan to circulate room air. Both mount the hot side for communication with the outside air and use a fan to circulate outside air. Both separate the cold side from the hot side by a partition. Both admit fresh air from outside for mixing with inside air. Both collect the condensate on a tray in the cold side and conduct it outside through the hot side of the unit. Babcock states in his patent (p. 1, line 7) that:

"Heretofore air conditioning units have been proposed which are suitable for use in a room which employ a refrigerating apparatus to cool the room air. Previous constructions have had serious faults."

He then details shortcomings which he proposes to overcome by his construction. All of these appear to have been previously overcome in the Melcher patent 1,-921,257.

25. The parties have stipulated that four Melcher air conditioning units, as described in the Melcher patent No. 1,921,257 were manufactured for and installed by the Chicago and North Western Railway Company between April 7, 1931 and June 10, 1931. These units were tested and found satisfactory for their purpose before August 8, 1931, and remained on the car until its retirement in 1945. Other similar Melcher air conditioners were subsequently manufactured and sold. The use of the Melcher equipment by the Chicago and North Western Railway Company was prior to Babcock's conception date. It was publicized through Railway Age on September 26, 1931, and Railway Mechanical Engineer in October 1931, both prior to the date on which Babcock filed his application. The result of the use of these units on the Chicago and North Western was fully described in these periodicals of national distribution.

26. Testimony was introduced to prove that Ward Thorne, of Chicago, Illinois, produced, tested and demonstrated to others a window-mounted air conditioner during the spring of 1931; that his unit as tested on a window sill, contained all of the usual components of a mechanical refrigeration apparatus; and that it antedated Babcock's conception date by several months. Plaintiff questioned the credibility of witnesses who were testifying to events of more than twenty-three years past and argued that inconsistencies in some details rendered such testimony unreliable. However, the Court, having observed the witnesses and having weighed the supporting evidence for their testimony, finds it worthy of credibility and finds that Thorne's conditioner did antedate Babcock's conception date.

27. Ward Thorne severed his connection with The Thorne Company in June or July 1932, when the company was re-

organized. At that time, an advertisement which appeared in the June 15, 1932 issue of Electric Refrigeration News had been prepared and published. That advertisement showed the window sill mounted air conditioning unit, and invited inquiries from established appliance distributors. Plaintiff contends that the evidentiary value of the advertisement is small as the photographs there shown are dated June 1932. Defendant, on the other hand, argues, and the Court agrees, that the project must have been considerably advanced to warrant this advertisement.

28. By June 1932, a large colored brochure had also been published. That brochure included photographs of one of the witnesses who testified at the trial, shown with one of his children and his late wife. It also showed photographs of the inside of the unit with the casing removed, as well as components of the air conditioner apparatus, which could have been made only from actual parts, one of which parts was produced as a physical exhibit. The brochure states the list price to be $149 and lists the exact dimensions of the cabinet. The advertising agent who prepared this brochure testified that it had taken some little time to prepare it and that preparation could not have started until after considerable work had been done, including design of the cabinet, design and building or buying of each operating component of the unit, and complete cost analysis of every part in the machine. The cost analysis must have followed a period in which potential suppliers of the parts had been contacted for quotations.

29. The large colored brochure in addition to photographs of the actual Thorne unit, stated:

"The entire mechanism is completely enclosed. There is nothing to get out of order—hence no servicing is needed. No 'installation' is required; simply place it in the window, plug it in, and turn the switch."

and:

"It is definitely designed to be placed into a window, not only to avoid using space which might be otherwise needed, but also because this provides an egress for the heat absorbed from the room which is being cooled."

thus indicating its unitary construction and portability; and:

"Wherever its cooling unit has been displayed, the Thorne Room Cooler has been acclaimed a marvel of refrigerating engineering."

and:

"An internal partition divides the cabinet into two halves, one of which, through its grill work is open to the outdoors, while the grill of the other opens into the room. In the one facing outdoors the condenser is located, while the evaporator is in the half within the room. Between the two of them, a small motor is placed, equipped with two fans. One of these fans (sirroco type) draws air from outdoors through the condenser, cooling the oil and the gas. The other draws air from the room, passes it over the evaporator (cooling coils), and sends the cooled and dehumidified air back into the room. The heat absorbed from the room is blown outdoors."

thus describing the construction of the Thorne unit, its operative structure and the means supplied to separate the various functions during operation. This brochure, publicly distributed and sent out by the Thorne Company in June, 1932, was a complete public disclosure to the industry and to the public, of the production of a window-sill mounted mechanical refrigeration air conditioning unit. It disclosed in detail the parts used and the arrangement of these parts, and corresponds to the disclosure in Thorne's earlier filed and later abandoned patent application.

30. On May 12, 1932, Ward Thorne contracted for 1,000 compressor units from Howell-Maisch Manufacturing Co., and agreed to purchase his entire requirements from Howell-Maisch for the ensuing year. The compressor comprised

eleven separate parts, all of which had been engineered and drawn up prior to May 12, 1932. In addition, The Thorne Company was to furnish seven other parts to Howell-Maisch for incorporation into the compressors. This preparation and engineering of small parts must have taken considerable time when done in a small organization.

31. On March 17, 1932, an application for patent was filed in the name of Ward Thorne on a Refrigerated Window Ventilator Unit, Serial No. 599,436. The drawings filed with that application disclose a window-sill mounted refrigeration apparatus for use as an air conditioner, having every feature of the Babcock patent except means to dispose of condensate—the tray beneath the evaporator with discharge tube to let gravity carry the condensate out of the window. However, according to the testimony of contemporary witnesses, Thorne made provision to dispose of the condensate in the actual machines built. Thorne had authorized the preparation of this application for patent as early as October 31, 1931, and his patent attorneys had caused a preliminary search to be made on this device. The search was reported from Washington associates on October 7, 1931. Documentation back to the date of October 7, 1931, supports testimony that the actual construction and testing of the device had preceded that date by some period of time.

32. Witnesses testified that the Thorne Room Cooler had been constructed and tested prior to the manufacture of a refrigerated truck by Thorne. That truck is shown in pictures in the October 1931 issue of The Ice Cream Trade Journal which must have been published before the Atlantic City Exposition of the Dairy Industries on October 26, 1931. This refrigerated truck must have taken some months to build, yet it was complete in October 1931 so that it could be driven to Atlantic City for the exposition.

33. Witnesses testified that the advanced stages of the testing of the Thorne Room Cooler were accomplished in a specially built test room in the plant of Mechanical Products Company, in the Clearing Industrial District in Chicago. This room was completed and used for the later stage of testing, Ward Thorne testified, before he went, as was his custom, to Cape Cod, late in July or early in August, 1931. He stated that he was able to date this transaction because his father-in-law became interested in merchandising the Thorne Room Cooler, which required breaking up a partnership arrangement previously accomplished with Lou Cox of Mechanical Products who built the test room. Cox then billed Thorne $1,200 for the construction of the test room.

34. Thorne and Vickers testified that they constructed the first window-sill mounted air conditioner in the Spring of 1931. Their descriptions coincide and demonstrate that the device resembled that shown in the drawings of the Thorne patent application. An air conditioner so constructed, similar to that shown in the colored brochure aforesaid, completely anticipated claims of the Babcock patent.

35. The objects and functions recited in the Babcock patent are found in the prior Thorne window air conditioner. Defendant's accused device and others commercially produced are more like the Thorne unit than the showing of the Babcock patent. In Thorne, the evaporator—cold side—and the condenser and compressor—hot side—were mounted on a flat base on the same level. That base rested on the window sill in a horizontal plane. Defendant's units are made in this way. In the Babcock patent, the housing is of an L or inverted U shape, so that the front part of the casing, enclosing the cold side, rests on the window sill, while the rear of the casing, enclosing the hot side, extends downwardly below the level of the window sill and behind the building wall. Defendant's units are not made in this way.

36. All of the events, testified to by Ward Thorne and the other witnesses to these events, occurred prior to July 1932 when Ward Thorne severed his relationship with the Thorne Company. He conceived the invention, built and tested the

machine, took photographs of a complete structure, including the various parts of the pump for inclusion in the colored brochure aforesaid, set up a pilot assembly line for manufacture, placed orders for parts, computed the retail price of $149, and advertised the same. It is unlikely that all this could have been accomplished in less time than that described in the testimony.

37. Any contribution to the industry in showing that an air conditioner could be mounted on a window sill was made by Ward Thorne when he constructed and tested his first units in the Spring of 1931, when he published the advertisement in June 1932 and the colored brochure aforesaid, all of which he dedicated to the public in 1933 when he abandoned his patent application.

38. Plaintiff represented to the Patent Office that the Thorne Room Cooler, in June 1932, was a commercially successful device which was in accordance with the Babcock patent application.

39. Defendant contends that Babcock's information was derived from H. Earl Hoover, and bases its charges of "unclean hands" and fraud on the Patent Office, primarily, on a design sketch, No. 4935. Except for the shape of the Babcock unit, defendant asserts that everything in the Babcock patent is disclosed in this drawing, including the features that the machine is a unitary structure, portable so that it may be easily mounted or removed for repairs, the unit placed on window sill, a baffle open to provide introduction of fresh air over the evaporator, and drip tray to lead condensed moisture out of the room. A notation on the drawing reads: "Drawn by Earl Babcock from information furnished by H. Earl Hoover."

40. Defendant produced no evidence showing that plaintiff, Babcock, or Hoover, or Demaree, had any reason to represent Babcock to be the inventor had Hoover been in fact the true inventor, or that plaintiff, Babcock, Hoover, or Demaree, stood to profit by representing Babcock to be the inventor had Hoover in fact been the true inventor.

41. The Court found the evidence on "unclean hands" and fraud to be inconclusive.

42. Through its own manufacturing efforts, plaintiff has made no commercial success from the Babcock patent. Some attempt has been made to exploit it by licensing.

43. Defendant has not manufactured a structure like that shown in the Babcock patent. In defendant's structure and casing all the refrigerating elements are supported on the same level which rests on the window sill, like that shown in the prior Thorne window air conditioner.

## Conclusions of Law

1. The Court has jurisdiction over the parties and the subject matter of this cause of action.

2. The venue of this action is in the Northern District of Illinois.

3. Plaintiff is the owner of United States Letters Patent No. 2,391,859 and all rights to recover for infringement thereof.

4. Defendant has not infringed claims 10, 14, 24, 26, 29 or 30 of said letters patent by manufacture, use or sale of air conditioners.

5. Each of the said claims of said letters patent is invalid and void as non-inventive over the art known on August 26, 1931, and invalid and void as anticipated by Melcher patent No. 1,921,257 and the work of Ward Thorne.

6. Defendant is entitled to judgment dismissing the complaint and awarding costs to defendant.